**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TIMOTHY TOOLAN, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION

Defendant.

Civil Action No. 25-8457

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Timothy Toolan ("Plaintiff"), on behalf of himself and all others similarly situated, for his Class Action Complaint against defendant New York Life Insurance and Annuity Corporation ("New York Life" or "Defendant"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly situated owners of certain universal life insurance policies insured by New York Life. Plaintiff seeks to represent a class of policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges imposed by New York Life.

2. Universal life policies are variable rate contracts. Unlike term or whole life policies, whose premiums are generally fixed and disclosed in advance, universal life policies have separate policy charges that are determined on an ongoing, prospective basis. The rates used to calculate those charges are variable and are required to be determined according to the factors set forth in

the policy. By far the largest charge in a universal life policy is the COI charge, which are generally calculated on a monthly basis by multiplying the net amount at risk (i.e., the death benefit amount minus the policyholder's account value) by the COI rate, and then deducted from the policyholder's account.

3. Where permitted by the policy language, insurers initially determine COI rates on an after-tax basis. That is, at the time a product is priced, the insurer sets COI rates and other charges to generate a certain amount of after-tax profit. Prior to 2018, virtually every insurer used a 35% corporate income tax rate assumption for product pricing.

4. In late 2017, however, Congress passed the Tax Cuts and Jobs Act (TCJA), which, among other things, reduced the corporate income tax rate from 35% to 21%. This was a boon for life insurance companies like New York Life. In 2017 and 2018, New York Life's parent company, which reports on a consolidated basis with New York Life, reported a $715 million tax benefit from the TCJA:

> The TCJA was enacted on December 22, 2017 and it significantly changed U.S. tax law primarily by lowering the corporate income tax rate from 35% to 21% beginning in 2018 and imposing a one-time tax on earnings from foreign subsidiaries where tax had been deferred. As a result, the Company recognized a $602 million income tax benefit for the year ended December 31, 2017 included in Income tax expense in the accompanying Consolidated Statements of Operations. In accordance with SAB 118, in 2017 the following income tax effects were recorded as provisional using reasonable estimates due to the need for further analysis of the provisions within the TCJA and collection, preparation and analysis of relevant data necessary to complete the accounting: 1) the effects related to the one-time tax on previously un-taxed foreign earnings, 2) restatement of life insurance reserves for tax purposes, and 3) the change to the assertion that earnings from foreign affiliates are indefinitely reinvested. During 2018, the Company completed the collection, preparation and analysis of data relevant to the TCJA and recognized a $113 million income tax benefit for the year ended December 31, 2018 included in Income tax expense in the accompanying Consolidated Statements of Operations.
>
> The impact of the TCJA is as follows (in millions):

| | 2018 | 2017 | Total |
|---|---|---|---|
| Deferred tax revaluation from 35% to 21% | $ (137) | $ (650) | $ (787) |
| Deemed repatriation | 24 | 39 | 63 |
| Miscellaneous | — | 9 | 9 |
| Total | $ (113) | $ (602) | $ (715) |

5. This $715 million windfall, which was primarily the result of a reduction in the amount of life insurance reserves required following passage of the TCJA, was in addition to the

ongoing and recurring benefits that New York Life has received and will continue to receive from the reduction in federal corporate income tax rates from 35% to 21%. For example, the first row of the following table from the parent company's 2018 Annual Report illustrates how New York Life and its affiliates will annually benefit by hundreds of millions of dollars from the reduction in the corporate tax rate, independent of the immediate $715 million TCJA windfall (which is shown in the seventh row):

The Company's actual income tax expense for the years ended December 31, 2018 and 2017 differs from the expected amount computed by applying the U.S. statutory federal income tax rate of 21% and 35%, respectively, for the following reasons ($ in millions):

| | 2018 | | 2017 | |
|---|---|---|---|---|
| Statutory federal income tax expense | $ 391 | 21.0 % | $ 1,142 | 35.0 % |
| Foreign operations, net of foreign taxes | 13 | 0.7 % | (32) | (1.0)% |
| Tax exempt income | (49) | (2.6)% | (137) | (4.2)% |
| Investment credits | (110) | (5.9)% | (136) | (4.2)% |
| Amortization and deductions of investments in qualified affordable housing projects | 28 | 1.5 % | 100 | 3.1 % |
| Non-controlling interest | (72) | (3.9)% | (97) | (3.0)% |
| Impact of TCJA | (113) | (6.1)% | (602) | (18.5)% |
| Other | (13) | (0.7)% | (12) | (0.2)% |
| Actual income tax expense | $ 75 | 4.0 % | $ 226 | 7.0 % |

Had the federal corporate tax rate stayed at 35% in 2018, the statutory federal income tax expense would have been $260 million greater.

6. New York Life's own statutory financial reports show similar impacts. For example, New York Life reported a $296 million statutory gain from "Impact of TCJA" in 2017, and its "Total federal and foreign income tax expense" plummeted from $546 million in 2017 to negative $2 million in 2018 to negative $11 million in 2024.[1] At the same time, the frequency and amount of dividends that New York Life pays to its parent company (New York Life Insurance

[1] New York Life's 2024 statutory financial report presents its total federal and foreign income tax expense under the caption "Federal and foreign income taxes incurred and change in net deferred taxes during the year," which is the same concept previously described in earlier reports as "total federal and foreign income tax expense."

Company) have only increased: after paying no dividend in 2016 and a $275 million dividend in 2017, New York Life increased its dividends to $600 million in 2018, $932 million in 2020, $942 million in 2021, $400 million in 2022, and $890 million in 2024.

7. The Society of Actuaries (SOA) has incorporated the tax change in its industry publications. For example, in its 2021 update to its Life Pandemic Model: U.S. Life Insurance Industry Moderate Scenario, the SOA changed the assumed tax rate from 35% to 21%.

8. The passage of the TCJA, which New York Life acknowledges in its reporting "significantly changed U.S. tax laws," should have led to a significant reduction in COI rates for New York Life's universal life policies. Under a 35% tax rate, an insurer like New York would have to earn pre-tax profits of roughly $154 million to realize an after-tax profit of $100 million. With a 21% tax rate, New York Life needs to generate only $126.6 million in pre-tax profits to produce the same $100 million in after-tax profits. This change alone would indicate that, following the enactment of the TCJA, New York Life should have reduced COI rates by 18%.[2] New York Life, however, has not reduced COI rates at all following the passage of the TCJA.

9. This violates the COI rate provision in Plaintiff's contract with New York Life, which requires that the COI rates used to calculate monthly COI charges "will be based on future expectations for investment income, mortality, persistency, taxes and expenses" and that "[t]he actual rate will be set by us, in advance, at least once a year." This means that if New York Life's expectations as federal income tax expense improve (that is, if it expects future tax expenses to decline), New York Life must adjust its COI rates downward to reflect the improvement. Yet since the TCJA took effect, New York Life has continued to set, change, and charge rates that do not

[2] $126.6 million is 82% of $154 million.

reflect in any way its reduced tax expectations or the additional profits that it is generating as a result of the TCJA.

10. New York Life's conduct is particularly galling given that life insurers have not hesitated to ***increase*** COI rates because of adverse changes in tax laws. In 1990, Congress passed the Revenue Reconciliation Act of 1990, which changed how insurers, for federal income tax purposes, amortized expenses associated with acquiring new business, and resulted in what insurance companies claimed were an increase in insurer tax liability.[3] Many insurers responded by increasing COI charges to pass along the increased tax liabilities to policyholders. However, some policyholders, and state regulators, were able to successfully challenge these rate increases in court or through regulatory action because taxes were not, back then, enumerated in the policies as a factor on which COI rates could or would be based. *See, e.g., Lee v. Allstate Life Ins. Co.*, 361 Ill. App. 3d 970, 972 (2005) (affirming certification of class alleging that insurer improperly passed along increased tax liabilities); *Bhat v. AmerUS Life, et al*, 3:96-CV-04627 (N.D. Cal. 1999) (class action for "improperly pass[ing] on increased tax expenses that were incurred by [it] as a result of Congress' 1990 passage of the Deferred Acquisition Cost Tax (the 'DAC Tax') through increased cost of insurance charges").

11. As a result of that first wave of COI litigation, many insurers changed their policy forms to expressly state that COI rates will also be based on taxes. New York Life is one of those insurers. Yet now that tax rates have dramatically improved, New York Life has pretended as if its expectations have not changed at all—while simultaneously telling their stakeholders how much more money they have made and will continue to make from lower tax rates.

---

[3] These changes are often referred to as the "DAC Tax," or "DAC Tax Reform." "DAC" stands for "deferred acquisition costs."

12. It is apparent that New York Life wrongly construes its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates in response to adverse changes in its tax expense expectations, but not requiring it to *decrease* COI rates in the face of an unambiguous and far more dramatic reduction in tax expenses that resulted from the TCJA. This interpretation is contrary to the plain language of the policies. As a result of New York Life's breaches, Plaintiff seeks monetary relief for the COI overcharges that New York Life has wrongly imposed on Plaintiff and all of its similarly situated customers who each own policies with the same or materially similar language at issue here.

## THE PARTIES

13. Plaintiff Jeffrey Toolan is an individual who is domiciled in and a citizen of Florida. Toolan owns a universal life policy issued by New York Life on September 13, 2011 as policy number 61136972 (the "Toolan Policy").

14. New York Life Insurance and Annuity Corporation is a corporation organized under the laws of Delaware and has its principal place of business at 51 Madison Avenue, New York, New York. New York Life issues universal life policies throughout the United States.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant, and the aggregate amount of damages exceeds $5,000,000. New York Life is incorporated in Delaware and has its principal office in New York, while Toolan and other unnamed class members are citizens of states across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

16. This Court has personal jurisdiction over New York Life because it is a citizen and resident of this State and issues policies in this State, including policies within the class asserted in this action.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(d) because New York Life resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### A. The COI Overcharge Policies at Issue

18. The policies at issue in this case are all flexible-premium, universal life policies ("UL" policies) issued by New York Life or its predecessors-in-interest stating that COI rates "will be based on future expectations of…taxes" and/or "expenses." These policies are referred to as "COI Overcharge Class Policies." The COI Overcharge Class Policies are all form policies, and owners cannot negotiate different terms. The COI Overcharge Class Policies are all contracts of adhesion.

19. Universal and variable universal life policies offer both a death benefit and a savings or investment component, often known as the "account value" or "policy value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life and term life insurance that require fixed monthly premium payments, UL policies only require that premiums be sufficient to cover the COI charges and certain other specified expenses. The COI charge, which is by far the largest charge imposed, is deducted from the policy value (i.e., the savings component) of the policy every month, so the policyholder forfeits the COI charge entirely to New York Life. Any premiums paid in excess of COI charges and other charges are applied to the account value.

These excess premiums earn interest. This structure is beneficial because it allows policyholders to set the savings level within the policy and earn a return on those savings.

20. The size of the COI charge is highly material to universal life policyholders. First, it dictates the minimum that policyholders must pay to keep a policy in force. Second, high COI rates can quickly diminish account value and thereby reduce the principal on which interest can be earned. As a general matter, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if the policyholder pays no additional premiums after adequate time provided by an accurate grace notice, the policy may lapse.

21. Because COI rates are variable rates, universal life policies almost always have contractual provisions that dictate the manner in which COI rates will be calculated. The Toolan Policy contains the following provision:

> **Cost Of Insurance Rate** The rates used to calculate the Cost of Insurance for the Initial Base Policy Face Amount and for each Base Policy Face Amount Increase are based on the Insured's age. gender and class of risk at the time the Initial Base Policy Face Amount or Base Policy Face Amount Increase took effect. ***They will be based on future expectations for investment income, mortality, persistency, taxes and expenses and will be in accordance with the procedures and standards filed with the Interstate Insurance Product Regulation Commission.***
>
> The monthly rates that apply to the Cost of Insurance for the Initial Base Policy Face Amount at all ages will not be greater than the maximum rates shown in the Table of Guaranteed Maximum Monthly Cost of Insurance Rates shown on Policy Data Page 2A attached to this policy ***The actual rate will be set by us, in advance. at least once a year*** Any change in the Cost of Insurance rate will be on a uniform basis for Insureds of the same classification. such as attained age gender and class of risk. ***Any change in these rates will be based on future expectations for investment earning, mortality, persistency taxes and expenses***.[4]

[4] Emphasis to italicized text added.

22. Under the terms of the Toolan Policy, if New York Life's expectations of future taxes change for the better (that is, if it expects future tax liability to decline), then it must adjust COI rates accordingly. New York Life cannot simply ignore positive changes to its future expectations, while reserving the right to increase COI rates if negative changes occur.

### B. New York Life Continues to Set, Change, and Charge COI Rates that are Not Based at All on its Dramatically Improved "Future Expectations for…Taxes and Expenses."

23. Insurers typically price their life insurance policies on an after-tax basis, meaning that—when the contract allows—COI rates and other charges are calculated to generate a certain target level of after-tax profits. Prior to 2018, virtually every "multi-factor"[5] UL policy was priced with an explicit tax assumption that the federal income tax rate would be 35%. New York Life priced the Toolan Policy and all other COI Overcharge Class Policies with an assumption that the corporate tax rate would remain at 35%.

24. In 2017, the corporate tax rate was dramatically reduced from 35% to 21%. This was a boon for life insurers like New York Life. New York Life's parent company reported that the immediate "Impact of TCJA" was $715 million for 2017 and 2018, in addition to the ongoing benefit of the rate reduction, and New York Life reported that its "Total federal and foreign income tax expense" dropped from $546 million in 2017 to negative $2 million in 2018. Other insurers adjusted their tax assumptions in similar fashion. Prudential, for example, recognized a $2.88 billion tax benefit in its Consolidated Statements of Operations for the year ended December 31,

[5] A "multi-factor" policy is a policy that identifies numerous cost factors on which COI rates are based, such as mortality, investment earnings, persistency, and expenses. A "single-factor" policy identifies only one factor on which COI rates will be based—generally mortality. The COI Overcharge Class Policies are all multi-factor policies.

2017. Protective Life recognized a provisional $797.6 million tax benefit in its consolidated statement of income for the year ended December 31, 2017.

25. The terms of the COI Overcharge Class Policies require New York Life to pass along those future tax reductions to policyholders via a COI decrease. Indeed, that is the entire purpose of variable rate contracts like universal life: if future expectations change for the worse, a carrier can contemporaneously elect to increase rates if consistent with the language of the policies; if future expectations change for the better, rates must come down. But New York Life has simply ignored its vastly improved expectations in its annual rate-setting.

### C. None of New York Life's Other Expectations Deteriorated, Let Alone to a Degree Sufficient to Offset the Impact of the TCJA.

26. It is impossible for any alleged deterioration in New York Life's expectations for non-tax factors enumerated in the policies (e.g., mortality, persistency, investment earnings) to have offset the positive impact of the TCJA. The change in corporate tax rate alone implies that, for a profitable block of universal life policies, COI rates should be reduced by roughly 18%.[6]

27. Indeed, New York Life has itself acknowledged in sworn statements that there were no adverse changes in mortality or any other anticipated experience factor. Each year, New York Life files responses to form interrogatories with the NAIC, which are signed by an actuary at New

---

[6] In addition to the change in corporate income tax rates, other changes in the TCJA also impact the taxation of universal life. The extent to which those other changes impact a specific product or block of policies depends on how those policies were priced, the level of premiums paid by the policyowner, the margins embedded in the COI rates, and what duration the policies were in. The actuarial consulting firm Milliman Inc. issued a white paper concluding that, for new policies issued after TCJA took effect, COI rates should be set at least 8% lower than they were pre-TCJA after taking into account all of the changes to life insurer taxation made by the TCJA. Regardless of whether TCJA necessitated an 18% reduction in COI rates on existing policies, or closer to an 8% reduction, the impact was highly material and could not possibly have been offset by deterioration in any other expectations.

York Life. The interrogatories include questions regarding the determination of non-guaranteed elements (which include COI rates) and whether expectations have changed.

28. For example, Interrogatory Question #4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" New York Life provided a virtually identical[7] answer for universal life in each of 2017, 2018, 2019, 2020, 2021, 2022, 2023, and 2024:

> Yes – when the non-guaranteed elements are determined or re-determined, the anticipated experience factors differ from the current experience in the following areas:
> a. Mortality, where anticipated experience is projected to improve based on past trends of mortality. This applies to AD108 UL CP, AD108 SUL CP, AD108 Nautilus SUL CP, AD108 UL LTG, AD108 SUL LTG, AD111 UL CP, AD111 SUL CP, AD109 UL CG, AD109 SUL CG, AD111 UL CG, AD111 SUL CG, AD113 UL CG, AD113 SUL CG, AD118 UL CG, AD119 ULCP, AD119 Advantage ULCP, AD119 SULCP, and AD119 Advantage SULCP.
> b. Expenses, where anticipated experience takes into consideration projected expenses.
> c. Morbidity, for Asset Preserver and Asset Flex, where experience factors are based on a blend of New York Life stand-alone Long-Term Care insurance experience and industry data and experience factors provided by outside consultants.

29. In none of these responses does New York Life assert that there has been deterioration in any experience factor, and for a number of products New York Life cites mortality ***improvement***. This confirms that none of the relevant experience factors deteriorated, let alone to such a degree that it would offset the positive impact of the TCJA.

30. NAIC also annually requires insurers to answer Interrogatory Question #7: to identify whether "there is a substantial probability that illustrations authorized by the reporting entity to be presented on new and existing business cannot be supported by currently anticipated

[7] The only difference in the responses is the list of products for which "anticipated experience is projected to improve based on past trends of mortality."

experience." Generally speaking, an illustration is a written estimate that New York Life provides policyholders that projects their policy's future anticipated costs. Under the standards of practice promulgated by the Society of Actuaries, illustrations must forecast anticipated future policy costs using COI rates that are "reasonably based on actual recent historical experience."

31. Both before passage of the TCJA and every year thereafter, New York Life responded to Interrogatory Question #7 that affirmed that "Authorized illustrations are supported by currently anticipated experience." This confirms that (1) New York Life has continued to monitor mortality and the other relevant experience factors, and (2) New York Life concluded, in the course of those reviews, that none of the experience factors have deteriorated in such a way as to make the illustrated rates unsupportable, let alone to such a degree that it would offset the positive impact of the TCJA.

32. Other publicly available information about the other factors enumerated in the policies also confirm that they have not deteriorated, let alone deteriorated so much as to offset the positive impact of the TCJA.[8]

33. ***First***, New York Life's expectations of future mortality for the COI Overcharge Class Policies have not deteriorated—if anything, they have improved. Mortality is generally the most significant component of COI rates. Beginning at least in 1941, the NAIC has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that insurers use to calculate reserves and to set maximum permitted COI rates in UL policies. The IRS also uses the CSO tables to define what constitutes "life insurance," what

[8] Plaintiff makes these allegations based on publicly available information. New York Life develops proprietary assumptions with respect to its expectations of mortality, persistency, and investment earnings, but does not disclose those to policyholders or the public.

constitutes a "reasonable mortality charge," and what is deductible for federal tax purposes. The CSO tables are conservative tables, which add scalars to the expected mortality.

34. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table for reserves until 2001. In 2001, at the request of the NAIC, SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table for reserves and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

35. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

36. The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements.

37. The 2001 CSO Mortality Table was generated from the 1990–1995 Basic Mortality Tables published by the SOA. Basic Mortality Tables are developed to be representations of mortality rates for the period identified in the table name. The SOA performs surveys of large life

insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975–1980 Basic Select and Ultimate Mortality Table
- 1985–1990 Basic Select and Ultimate Mortality Tables
- 1990–1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

The 2001, 2008 and 2015 Valuation Basic Tables each show significant mortality improvement. The report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990–1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee ('ILEC') have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development."

38. This trend of improving mortality expectations has continued. In 2017, for example, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies, including the Policies here. The SOA updates this study annually and these studies show improving mortality across the board for the last five years, with no negative figures in any published table from 2013 and 2017. And in 2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the mortality rate as of 2018 was the lowest mortality rate in U.S. history.

39. COVID-19 did not emerge worldwide until 2020, and the increase in mortality resulting from that was (a) relatively small in historical terms, (b) generally viewed by the industry as transitory, with insurers still projecting future mortality improvement to continue.

40. The bottom line is: expectations of future mortality improved and represent a substantial benefit to New York Life, which, independently of the TCJA, should have led to a further reduction in rates. And, at a minimum, nothing has occurred since the COI Overcharge Policies were issued that would have resulted in a deterioration of New York Life's expectations of future mortality that were sufficient to offset the future benefits of the TCJA.

41. ***Second***, New York Life's expectations of investment income have not deteriorated; they have, if anything, improved. Changes in expectations of investment income are primarily reflected in credited rates, and New York Life is currently crediting Toolan at a rate of 4.05%, which is in excess of the 2.50% guaranteed minimum credited rate. Further, ten-year Treasury rates have climbed from roughly 2.4% when the TCJA was passed to over 4.4% today, and insurers earn well in excess of Treasury rates through their sophisticated investment strategies.

42. ***Third***, it is implausible that New York Life's persistency expectations could have deteriorated to such a degree as to offset expense improvement. New York Life's regulatory submissions do not mention any persistency deterioration or suggest that profitability is highly dependent on high or low lapse rates.

43. ***Fourth***, New York Life's expectations of future "expenses" that are not taxes could not have changed materially for the worse in recent years to offset the dramatic improvements in tax expectations. Beyond taxes, the only expenses are administrative expenses associated with maintaining and administering the insurance contracts. The allocated expense of maintaining insurance contracts is usually nominal and does not change materially from year to year, let alone

in a way that could offset the massive improvement in tax assumptions. Each year the SOA publishes a Generally Recognized Expense Table ("GRET") containing a summary of expense charges reported by insurance companies to the NAIC. This table shows that the majority of expenses are incurred in the origination of the policy such as brokerage fees (labeled as acquisition costs). These costs have already been incurred on issued policies and do not feature in prospective calculations of future expectations of expenses. Furthermore, the GRET tables show little change in ongoing maintenance costs, for example the suggested per unit maintenance cost for a directly originated policy was $60 in 2017 and $59 in 2023 as improved IT system efficiency has offset inflation. In addition, New York Life already imposes other charges to cover these expenses. In addition to the COI charge, New York Life imposes a premium expense charge, a monthly "administrative fee," and a "monthly per thousand of base policy face amount charge."

## CLASS ACTION ALLEGATIONS

44. This action is brought by Plaintiff individually and on behalf of a class—the COI Overcharge Class—pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The COI Overcharge Class consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued or insured by New York Life Insurance and Annuity Corporation or its predecessors in interest that state that cost of insurance rates will be based on future expectations that include taxes and/or expenses.

The COI Overcharge Class does not include Defendant, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

45. Plaintiff reserves the right to seek certification of subclasses, or alternative classes, by original issuing company, product, state of issue, or dates of ownership.

46. The COI Overcharge Class consists of hundreds or thousands of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities

and addresses of class members can be readily ascertained from business records maintained by New York Life.

47. The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

48. Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the COI Overcharge Class.

49. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

50. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

51. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the COI Overcharge Class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether New York Life breached the policy provisions by ignoring the impact of the TCJA each time it set COI rates; and

(c) whether Plaintiff and members of the COI Overcharge Class are entitled to receive damages as a result of the unlawful conduct by Defendant as alleged herein and the methodology for calculating those damages.

52. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when New York Life's liability has been adjudicated, claims of all COI Overcharge Class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and New York Life's violations of law will continue without redress while New York Life continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

53. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the COI Overcharge Class.

54. The New York Life policies are binding and enforceable contracts.

55. New York Life has repeatedly breached its contracts with Plaintiff and the COI Overcharge Class by applying current COI rates that were not, and are not, based on future expectations as to taxes and deducting COI charges calculated based on those unlawful rates. The damages of Plaintiff and the COI Overcharge Class include, but are not limited to, the excess COI

charges that New York Life deducted by not determining COI rates based on the factors set forth in the COI Overcharge Class Policies.

56. New York Life's failures also breach the covenant of good faith and fair dealing that is implied by law in all contracts.

57. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by New York Life's conduct as set forth herein.

58. As a direct and proximate cause of New York Life's material breaches of the policies, Plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the class members pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the class compensatory damages;

3. Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as any costs and attorneys' fees allowed by law; and

4. Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances, including without limitation reinstatement and other equitable relief for policies that lapsed or were surrendered after New York Life's breaches.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated: October 13, 2025

Respectfully submitted,

*/s/ Ryan C. Kirkpatrick*

Seth Ard
Ryan C. Kirkpatrick
Ari Ruben
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: 212-336-8330
Facsimile: 212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
aruben@susmangodfrey.com

Steven G. Sklaver (*pro hac vice* to be filed)
Glenn C. Bridgman (*pro hac vice* to be filed)
Halley Josephs
Kimberly C. Page (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
hjosephs@susmangodfrey.com
kpage@susmangodfrey.com

*Attorneys for Plaintiff*